FOREST COUNTY, Respondent, vs. POPPY and another,
Appellants.

*April 9—June 20, 1927.*

*Depositories: County treasurers: Deposit of public moneys in banks
not designated by county: Due diligence not defense on loss:
Liability for checks subsequently dishonored: Transfer of
funds to designated depository: Risk of loss during transfer:
County orders void through non-presentment: Liability of
treasurer for funds: Subrogation of treasurer and surety to
rights of county.*

1. Public officials take their offices *cum onere;* and due diligence
   on the part of a treasurer or other depository of the public
   moneys is not recognized as a defense in an action on his of-
   ficial bond.   p. 276.
2. An official custodian of public funds is held to a very strict
   accountability, and is responsible for money illegally dis-
   bursed, regardless of whether the municipality to which the
   money belongs received an equivalent or not.   p. 277.
3. A bank designated by a resolution of the county board as a de-
   pository of county funds, but which did not comply with the
   conditions of the resolution requiring it to furnish a bond,
   was not a county depository.   p. 279.
4. A county treasurer who accepted a check which was subse-
   quently dishonored by the drawee bank, receipting therefor
   as cash and entering it on his books as cash, and giving the
   county clerk a duplicate receipt as required by law, became
   responsible to the county for money thus collected, and could
   not deny his liability therefor.   p. 279.
5. The fact that county orders drawn on a bank had become void
   under the statutes of limitation, so that the county was no
   longer liable, did not relieve the county treasurer from lia-
   bility to the county for a loss sustained by his wrongful de-
   posit of money in such bank, since money in the county treas-
   ury remains money of the county until it is paid out accord-
   ing to law.   p. 280.
6. Where a county treasurer wrongfully deposited money in a
   bank which was not a county depository, and later drew a
   draft on such bank to transfer the money to a county deposi-
   tory, but the bank failed before the money was transferred,
   the treasurer was liable for the loss sustained, since he had
   not performed his duty until the cash was in a legal deposi-
   tory.   p. 281.

7. In such case the treasurer made the bank where he deposited his sight draft his agent to transfer the funds in question, as regards liability for loss sustained when the bank failed before the transfer was completed; and he cannot escape liability for the loss of funds occasioned by the failure of the bank in which he wrongfully deposited the money, by pleading the negligence of his agent in not procuring the money on the draft drawn on such bank.  p. 281.

8. The treasurer and his surety, on payment to the county of a judgment for loss sustained because of the treasurer's wrongful deposit of money in a bank not a county depository, may be subrogated to all the rights of the county as to third parties.   p. 281.

ESCHWEILER, J., dissents in part.

APPEAL from a judgment of the circuit court for Forest county: W. B. QUINLAN, Circuit Judge.  *Affirmed.*

This is an appeal from a judgment in favor of the plaintiff and against the defendants.

The action was brought by the county against the county treasurer and his surety to recover funds belonging to said county, of which the treasurer was the official custodian.

The matter was referred to a referee, who took the testimony and made his report, finding in favor of the plaintiff, and such report was thereafter approved by the circuit court and judgment rendered accordingly.

For the appellants there was a brief by *Classon, Whitcomb & Kuzenski* of Oconto and *J. A. Walsh* of Crandon, and oral argument by *Walter F. Kuzenski* and *Allan V. Classon.*

For the respondent there was a brief by *Geo. H. Dawson* and *D. G. Classon,* both of Oconto, and oral argument by *Mr. Classon.*

The following opinions were filed May 3, 1927:

CROWNHART, J.  Before approaching the question involved on this appeal it may be well to state the general principles of law governing the duties of public officers charged with the care of public funds.

This court has uniformly held public officials to a strict fulfilment of their official duties. Good public policy requires that this rule be maintained in all its essentials.

In an early case in this court, *Crocker v. Brown County,* 35 Wis. 284, it was said that public officials take their offices *cum onere,* that is, they take them with all the responsibilities attached. In *Omro v. Kaime,* 39 Wis. 468, the court quoted approvingly from *U. S. v. Prescott,* 3 How. 578, as follows:

"Public policy requires that every depositary of the public money should be held to a strict accountability. Not only that he should exercise the highest degree of vigilance, but that 'he should keep safely' the moneys which come to his hands. Any relaxation of this condition would open a door to frauds, which might be practiced with impunity. A depositary would have nothing more to do than to lay his plans and arrange his proofs, so as to establish his loss, without laches on his part. . . . No such principle has been recognized or admitted as a legal defense."

This court then added:

"And we have certainly no disposition to relax the rule of liability on the part of treasurers intrusted with public moneys, by recognizing such a principle [due diligence of the treasurer] as a legal defense to an action upon their official bonds."

The case of *U. S. v. Prescott,* there cited, was one where a receiver of public funds, being sued on his bond, set up for a defense that the moneys had been feloniously stolen from him although he used due diligence to safeguard the funds. To the quotation by our court the United States supreme court added:

"As every depositary receives the office with a full knowledge of its responsibilities, he cannot, in case of loss, complain of hardship. He must stand by his bond, and meet the hazards which he voluntarily incurs. . . . Prescott and his sureties are not discharged from the bond by a felonious stealing of the money without any fault or negligence on the part of the depositary; and, consequently, that no such defense to the bond can be made."

The rule in the *Prescott Case* has been generally followed in this country. 22 Ruling Case Law, 468, states the principles thus:

"It is one of the duties of a public officer intrusted with public moneys to keep them safely, and this duty of safe custody must be performed at the peril of the officer. In effect, according to the weight of authority a public officer is an insurer of public funds lawfully in his possession, and therefore liable for losses which occur even without his fault. The liability is absolute, admitting of no excuse except perhaps the act of God or the public enemy. This standard of responsibility is based on public policy."

In *Milwaukee v. Binner,* 158 Wis. 529, 149 N. W. 211, this court said:

"It is the policy of the law to hold an official custodian of public funds to very strict accountability, and to make him responsible for money illegally disbursed, regardless of whether the municipality received an equivalent or not. There is no other safe course, and any attempt to evade the law must receive judicial condemnation upon every opportunity therefor."

We take this occasion to reaffirm the public policy so stated. The fact that hardship may result occasionally must not alter a public policy founded in public necessity.

There is no substantial dispute as to the facts in this controversy. The appellant *Poppy* was county treasurer for the respondent county during the years 1925 and 1926. The appellant surety company was the treasurer's bondsman.

The board of supervisors of *Forest County* duly designated as qualified depositories of the county treasurer's funds the Forest County State Bank, the State Bank of Wabeno, and the Laona State Bank, and no others. The county treasurer, disregarding this designation, deposited certain funds of the county in the First National Bank of Crandon, and refused to deposit said funds in the designated depositories until required by *mandamus* of the circuit court to do so. He then attempted to transfer the funds to the

proper depositories by means of checks or drafts drawn on the First National Bank, but before certain of such checks or drafts had been cashed and paid into the proper depositories the First National Bank of Crandon failed and went into bankruptcy.

The referee found that there were six items in controversy. The first item represents the balance of county funds in the First National Bank of Crandon when the bank failed, less dividends paid by the bankrupt after the bank closed. The county treasurer attempted to transfer the funds in the First National Bank to the Laona State Bank and the Wabeno State Bank by drafts, which drafts were received and credited to the county treasurer by such banks, but before said banks could secure a transfer of the funds the First National Bank failed and the drawees charged the amounts back to the county treasurer.

It is the contention of the appellants that the First National Bank of Crandon was a county depository and the county treasurer had a right to deposit the funds therein. Appellants base this contention upon the fact that the First National Bank, prior to the resolution of the county board on November 11, 1924, was a duly designated depository, and that the county board had not lawfully changed such depository. This contention seems to be frivolous. The county board, in November, 1924, passed a resolution designating depositories for the county funds, among others the First National Bank of Crandon, conditioned upon their furnishing such bonds as the board might require, and in case any bank should fail to furnish such bond, then the portion that such bank might be entitled to otherwise receive should be divided among such banks as did qualify. The First National Bank of Crandon did not furnish such bond. On February 10, 1925, the county board, by resolution, provided that each depository of the *Forest County* funds, named at the November meeting of the board, be required to furnish surety bonds of at least $15,000, and that such

bonds be filed with the county clerk on or before March 15, 1925, and it further provided that the treasurer should keep the county's moneys in those banks which had filed such bonds, in approximately equal amounts. The First National Bank of Crandon failed to comply with this resolution, and clearly, thereafter it was not a county depository, and the county treasurer and his bondsman became absolutely liable for any loss occasioned by deposits in such bank. *Sawyer County v. Frets,* 189 Wis. 372, 375, 207 N. W. 940.

As to the second item, it is contended by appellants that the county treasurer is not liable for the reason that a check received by the county treasurer from District Attorney Dawson, and accepted by him in payment of a forfeited bail bond, was not paid by the drawee bank. The county treasurer accepted such check as cash and receipted therefor. He had a right to refuse the check and demand cash instead, but he did not do so. The county treasurer, in accepting the check of Dawson, receipting therefor as cash, entering it on his books as cash, and giving the county clerk a duplicate receipt as required by law, cannot now be heard to deny his liability therefor. He became responsible to the county for money thus collected, and he is relegated to his rights against the maker of the check.

As to the third item, the county judge, J. A. WALSH, by means of his check paid over fines to the county treasurer to the amount of $153.45, and the transaction is identical in principle with the Dawson check. It is ruled by what has been said with reference thereto.

As to items four and five, it appears that county orders had been issued on the First National Bank of Crandon and on the old Citizens State Bank, which orders had never been cashed and had become void by reason of the statutes of limitation. It is contended by the appellants that because the county was no longer liable to pay the orders there was no loss by reason of the failure of the bank. This is a rather novel defense. On that theory, whenever county or-

ders should become invalid by reason of the statutes of limitation, the money in the county treasury represented by the orders might be immediately purloined by the county treasurer. County treasurers will have no opportunity to enrich themselves by any such process. The money in the county treasury remains the money of the county until it is paid out according to law.

As to item six: On the 20th of April, 1925, the county treasurer deposited his sight draft on the First National Bank of Crandon with the Forest County State Bank for $2,523. The Forest County State Bank credited his account accordingly, on April 21st. On the same day the First National Bank of Crandon debited the county account in the same amount. On April 27th the Forest County State Bank debited the county treasurer with $2,347.74. This book-keeping result was accounted for by the method of the two banks in clearing their checks. The Forest County State Bank received a draft from the First National Bank on April 21st, drawn on the Minneapolis Reserve Bank, for the amount due it on the clearance of their checks, to wit, $2,347.71, but before the Minneapolis Reserve Bank had received payment of the draft in the usual course, the First National Bank failed; therefore the Minneapolis Reserve Bank charged the amount back to the Forest County State Bank, and the Forest County State Bank in turn charged it back to the county treasurer.

The appellants urge upon our consideration the law of negotiable instruments. The appellants, by being subrogated to all the rights of the county, may have occasion to seek relief thereby, but here we are concerned with the simple question of whether the county treasurer has properly accounted for the funds intrusted to his care. He was a public official, required to safely keep such funds, and to account therefor as lawfully required.

The county treasurer wrongfully deposited the county's

money in the First National Bank.   For this he was solely
responsible, and until he had placed it safely in a legal de-
pository of the county he continued liable for any loss there-
of.   He sought to transfer the cash by draft on the First
National Bank, given to the Forest County State Bank, and
thereby he made such bank his agent in making the transfer. ·
He now charges the Forest County State Bank in effect with
negligence in not procuring the money.   Whatever the facts·
may be in that regard the county is not concerned.   The
bank's acts were the acts of the county treasurer as his
agent.   The treasurer cannot escape liability by pleading the
negligence of his agent.   His duty was to deposit the cash in
a legal depository.   Until he did so he had not complied with
the law.

It is said that the county treasurer followed a usual and
customary practice by accepting and disbursing county funds
by means of checks and drafts.   Ordinarily there would be
no moral delinquency in such proceedings, although the legal
responsibility would still be that of the treasurer.   But in this
case the treasurer brought about his undoing by his perti-
nacious conduct in keeping county funds in the First Na-
tional Bank contrary to law.

The circuit court properly held that the treasurer and his
surety, upon payment to the county of the judgment herein,
may be subrogated to all the rights of the county as to third
parties.

*By the Court.*—The judgment of the circuit court is af-
firmed.

ESCHWEILER, J. (*dissenting in part*).   With the court's
disposal of three of the items involved I disagree.

The complaint alleged the receipt by the defendant county
treasurer of over $17,000 for which he had failed to account
as required by law, leaving that amount of a shortage, and
that such sum was appropriated and converted by the de-

fendant to his own use.   No claim was asserted of possible negligence by the defendant treasurer in collecting moneys due the county.

After testimony was taken it was admitted that the maximum amount for which he could be held was less than $7,000, and was the amount for which plaintiff had judgment.

Two of these items, namely, the $500 check made payable to the district attorney and by him indorsed to the county treasurer on attempted release of a forfeited bail bond, and the check of the county judge for $153.45 on account of fines and costs, were neither of them converted into cash and received as cash by defendant *Poppy,* nor did he appropriate the same in any manner to his own use and he was not enriched thereby.   The testimony was undisputed that the bail bond to discharge which the $500 check had been given to the district attorney had not been discharged.

The record discloses that the plaintiff's witness, the auditor of the account upon which the plaintiff obtained judgment, testified as to these two items that they were not actually claimed as shortages; that the defendant treasurer was charged therewith in such accounting because and only because he had issued his receipt for those two items and did not have the money.   In the opinion of the referee supporting the findings upon which the liability was adjudged, he dwells upon the fact that no effort was made by the county treasurer to enforce collection of these two checks against their solvent respective makers.

The matter is therefore left in doubt as to whether or not the liability as to these two items is predicated upon a theory that the giving of a receipt by the county treasurer is conclusive against him that he has received cash for the county's credit, or upon a theory of negligence on his part in failing to realize in actual cash the face of these two checks.   On

neither theory is there any showing that *Poppy* converted or embezzled any part of these two amounts or that the county has actually suffered damage.

No authority is cited because very likely none can be found, that a mere giving of a receipt by a county treasurer as for county money which, as a matter of fact, he does not receive is so absolutely conclusive against him that he is foreclosed from explanation thereof, as is in effect the present holding. Such a writing as a receipt has always been held open for explanation. Even were it executed under the formality of a seal, still such would only make it *prima facie* or presumptive evidence of the existence of some consideration for the same. Sec. 328.27, Stats.; *Merrill v. Focht,* 172 Wis. 575, 579, 179 N. W. 813.

Even as against a bond under seal importing a consideration it has been held that guarantors, parties thereto, may nevertheless show the fact to be that such was given for a past indebtedness and therefore without consideration as to them. *John A. Tolman & Co. v. Infusina,* 170 Wis. 433, 435, 175 N. W. 916. If so in such a case, I can see no reason why not applicable here.

The issuing of a tax receipt by a county treasurer, he having been deceived by the tender of a counterfeit currency or forged check, ought.not to be held as relieving the taxpayer and placing the burden on the treasurer. When the treasurer and his surety are required to account for *money* received by the treasurer for and on behalf of the county, it should be shown that the treasurer did receive *money.*

Under the facts here and the theory of the complaint I think there is no support for the finding holding the defendant and his surety responsible for these two items, it plainly appearing that they were not cash received by him belonging to the county; no part thereof was converted or appropriated to his own use; and the county has suffered no actual loss

or damage.  If there be any breach of official duty in connection with these two transactions by any public officials of *Forest County,* it was by the two officers from whom the county treasurer received the two checks in lieu of the cash which it was incumbent upon such other officials to pay in to the county treasury.  If the treasurer had no power or authority to receive checks in lieu of cash, it must be equally true that the district attorney and the county judge respectively had no power or authority to tender checks in lieu of cash.

As to the item of $2,347.74: This liability arises not because the county treasurer appropriated or embezzled a dollar of the item or took any unusual, improper, or unlawful action with reference to it, but because, after having been credited on April 21st on the books of the State Bank, the lawfully designated and acting county depository, with the $2,523, and after his draft or check on the First National Bank of April 20th for $2,523 had been presented to, regularly accepted, and marked "Paid" by the First National Bank, and the account of the county charged therewith on its books, he subsequently, on April 27th, as a matter of bookkeeping, was charged, at the instance of the State Bank, with the lesser amount of the face of the Minneapolis sight draft given on the clearance between the State Bank and the National Bank of Crandon on April 21st, the last day on which the National Bank was open for business.  On such date, it is conceded that the State Bank could have demanded and received from the National Bank the amount thereof in cash; nevertheless it, as designated county depository with bond given to secure the county, elected to give *Poppy,* as treasurer, credit by and through this transaction for the full amount of the draft or check.  In the clearance transaction of the next day, when this draft or check was used by the State Bank in connection with a number of other items (possibly ten to twenty) of similar though probably smaller amounts,

each one of such was, so far as the State Bank was concerned, in exactly the same situation towards it as was the one with *Poppy*.   Yet, on the mere election of the State Bank to charge the entire amount of the clearance transaction against *Poppy* and not proportionately only or entirely against some one other, it is by the holding here made the basis of a conclusive finding in effect that *Poppy* embezzled or appropriated to his own use county funds to the extent of the Minneapolis draft.   If the State Bank had no lawful authority so to charge back, then the county treasurer has properly accounted for this item.

By sec. 118.64, Stats. (the Negotiable Instruments Law), where the holder of a check procures it to be accepted or certified, the drawer and all indorsers are discharged from liability thereon.

The transaction by which the State Bank presented this draft or check on the National Bank and had it treated as a substitute for cash or used as against its own checks paid in cash during the same period by the National Bank was the exact equivalent of the National Bank paying this amount in cash to the State Bank, the county depository, and then taking the cash back for credit on its transactions with State Bank.   *Union State Bank v. Peoples State Bank,* 192 Wis. 28, 211 N. W. 931.   By this transaction the State Bank became the owner of the paper as against the treasurer and was not his agent for collection.   *Douglas v. Federal Reserve Bank,* 271 U. S. 489, 492, 46 Sup. Ct. 554.   This latter case holds (p. 493) that the custom or agreement of a bank to charge back to the depositor in the event of dishonor does not change the legal effect of the transaction as above stated.

I think the result reached here by affirming the judgment as to this item holds the defendant county treasurer and his surety for an item not one dollar of which was appropriated or embezzled by the treasurer or went to his profit, and is

contrary to established law governing transactions between a depositor, such as was the treasurer, and the bank in which he made the deposit, the chosen depository of the county.

A motion for a rehearing was denied, with $25 costs, on June 20, 1927.